AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_____ District of _____

| | ) | |
|---|---|---|
| *Plaintiff(s)* | ) ) ) ) ) | |
| v. | ) | Civil Action No. |
| *Defendant(s)* | ) ) ) ) ) ) | |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
                                                *Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

------------------------------------------------------------------ x

GAVINO MR. RIVAS,

                 Plaintiff,

-against-

CITY OF LEAGUE CITY and LEAGUE CITY POLICE
DEPARTMENT,

                 Defendants.

------------------------------------------------------------------ x

Case No.:

**VERIFIED COMPLAINT**

NOW COMES Plaintiff, GAVINO MR. RIVAS by and through undersigned counsel, Tully Rinckey P.L.L.C., and as for his complaint against Defendants CITY OF LEAGUE CITY and LEAGUE CITY POLICE DEPARTMENT, (hereinafter, "Defendants"), states:

## I. NATURE OF THIS ACTION

1. This is a civil action brought pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. 4301 et seq. City of League City and League City Police Department violated Mr. Rivas rights by terminating him on the basis of his membership in the United States Army.

## II. THE PARTIES

2. Plaintiff Gavino Mr. Rivas (hereinafter, " Mr. Rivas or Plaintiff") is an individual resident of Harris County, Texas.

3. The City of League City, Texas (hereinafter "League City") is a municipality.

4. League City Police Department (hereinafter "Department") is a Department of League

City.

5. Prior to January 28, 2011, Mr. Rivas was employed as a League City Police Officer.

6. Upon information and belief and at all relevant times hereto, Sergeant Kevin Schroeder (hereinafter, "Sergeant Schroeder") was Mr. Rivas' supervisor at the League City Police Department.

7. Upon information and belief and at all relevant times hereto, Sergeant Kevin Schroeder had the decision-making authority to control the terms, conditions and privileges of Mr. Rivas' employment, including promotions and transfers.

## III. STATUE OF LIMITTIONS

8. USERRA does not have a statute of limitation. See 38 U.S.C. § 4327.

## IV. JURISDICTION

9. This is an action for damages and for injunctive relief pursuant to the Uniformed Services Employment and Reemployment Rights Act, as codified at 38 U.S.C. §4301, et seq. (hereinafter "USERRA"), and is within the jurisdiction of this Court pursuant to 38 U.S.C. §4323(b)(2) and 28 U.S.C. §1331.

## V. VENUE

10. Venue is proper in this judicial district pursuant to 38 U.S.C. §4323(c)(1) and 28 U.S.C. §1391(b), insofar as the acts giving rise to Mr. Rivas' claim occurred in this judicial district.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## VI. FACTUAL ALLEGATIONS

12. Mr. Rivas graduated from Clear Creek High School in League City, Texas in 1987. He

attended the United States Naval Academy, earning a Bachelor of Science Degree in Aerospace Engineering in 1992. He also earned a Master of Arts Degree in Mass Communications and Media Studies from San Diego State University in 2009.

13. Upon graduating from the Naval Academy, Mr. Rivas was commissioned a Second Lieutenant in the United States Marine Corps and served for approximately ten (10) years on active duty as a CH-46 Helicopter Pilot. In 2002, he transferred to the Marine Corps Reserve to become a Civil Affairs Team Leader and was deployed to a combat tour in support of Operation Iraqi Freedom in 2003. Mr. Rivas had a break in service for approximately ten (10) years from the Marine Reserve when he joined the Army Reserve on May 19, 2011.

14. In 2008, Mr. Rivas' mother suffered a heart attack, and he returned to League City to assist with her care. To remain close to his family and available as needed, he applied to the League City Police Department in August 2009.

15. Mr. Rivas was hired on October 26, 2009 as the department's top applicant. Mr. Rivas graduated from the University of Houston Downtown Campus Police Academy, where he earned the rank of Class Captain and Honor Graduate. Mr. Rivas also transferred to the United States Army Reserves attending required monthly battle assemblies, drills, and annual training.

16. Following the successful completion of field training, Mr. Rivas was assigned to the night shift as part of the patrol division. He distinguished himself as one of the top officers in arrests for Driving While Intoxicated, with an approximate 99% conviction rate. He also assisted in updating procedures for officers of the department in completing all necessary filing associated with DWIs.

17. Mr. Rivas was a dedicated, hard-working employee who thrived at the Department. He was consistently rated high among his peers, and was rated among the top five (5) officers in

arrests, traffic stops, and accident investigations. Mr. Rivas also earned the Texas Intermediate Peace Officer Proficiency Certification while at the Department.

18. In February 28, 2011 while responding to a non-emergency situation to assist another officer, Mr. Rivas struck a street sign and damaged both the sign and police vehicle. Mr. Rivas received a written reprimand for the minor vehicle accident with no other punishment given.

19. In April of 2011, Mr. Rivas earned a certification as a law enforcement instructor through the League City Police Department training division. As part of authorized supplemental employment, he petitioned the department to teach at the University of Houston Downtown Criminal Justice Training Center as a police academy instructor. Upon information and belief, He received permission from then Chief of Police, Michael Jez, and began teaching courses in Traffic Law, Accident Investigation, Traffic Direction, Driving While Intoxicated Stops, and Use of Force.

20. In August of 2011, Mr. Rivas passed the Department's screening for assignment to Special Operations Division as Motors Officer. The position required a two-year contract with League City, with the purchase and maintenance of a city-approved motorcycle. League City provided insurance, a fuel card, a six hundred seventy-five dollars ($675) monthly stipend, and an additional annual reimbursement of six hundred and seventy-five dollars ($675) for any necessary repairs.

21. Mr. Rivas purchased a new 2012 BMW RT 1200 RT-P at a cost of $24,000.00 and completed a one week a basic police motors course held by the Houston Police Department's Motors Division in October 2011.

22. The above training was followed by a two-week intensive Northwestern University Advanced Police Motorcycle Operator Training in January 2012 hosted by the Houston Police

Department. These courses were all in addition to other required training in accident investigation, marine patrol, and honor guard detail. Mr. Rivas passed all required courses.

23. Upon information and belief, and at all relevant times hereto, Sergeant Kevin Schroeder (hereinafter, "Sergeant Schroeder") was the supervisor of the Unit.

24. On November 29, 2011, Mr. Rivas was temporarily scheduled to shadow Officer Matt Strachan, the other motor officer, from 7:00am to 3:00 pm as part of Mr. Rivas' introduction to his new duties.

25. Mr. Rivas received a subpoena weeks earlier to appear in court for a case where he was the arresting officer and was to meet the Assistant District Attorney in his office in the morning and expect to be the courthouse all day.

26. Mr. Rivas informed his supervisor, Sergeant Kevin Schroeder, and Officer Strachan of the subpoena promptly upon receiving it.

27. Shortly after 7:00am, the Special Operations Division's Lieutenant Tony Hera (hereinafter, "Lieutenant Hera") asked Sergeant Schroeder where Mr. Rivas was located, and Sergeant Schroeder responded that he did not know. Although Mr. Rivas had properly informed his supervisor as to the subpoenaed appearance, Mr. Rivas received a written reprimand for reporting late for duty.

28. Mr. Rivas completed the following training and/or courses: Houston Police Department Basic Motor Couse, Northwestern University Center for Public Safety Police Motorcycle Operator Training, Basic Accident Investigation, Advanced Accident Investigation, Harris County Sheriff Marine Safety Enforcement Officer Certification, and Houston Police Department Honor Guard Certification.

29. Mr. Rivas began working on or about November 1, 2011 as a Motor Officer with his

primary duty being speed enforcement; however, Mr. Rivas waited until his motorcycle was complete before he started his actual work related duties onboard a motorcycle until after January 1, 2012. The only tool available to Mr. Mr. Rivas to detect speed was the city-owned speed measurement laser (hereinafter, "LIDAR"). The Department did not provide Mr. Rivas with any means of securing the LIDAR to his motorcycle even though Mr. Rivas requested it from the Department.

30. Previous officers had placed their LIDAR in saddle bag of the Harley Davidson motorcycle variant. However, this was not an option for Mr. Rivas' city-approved BMW police motorcycle as the saddle bag is not accessible from on the bike.

31. In June of 2012, after several months on the motorcycle and looking for a commercially available LIDAR holder proved unsuccessful, Mr. Rivas had a friend who does metal work fabricate one. Mr. Rivas had no issues with the constructed holder for the approximate five months prior to his deployment. Sergeant Schroeder was aware of its use, having looked and commented upon it while in the rear parking lot of the police station.

32. Mr. Rivas received a written reprimand for speeding in a city vehicle on April 10, 2012 while responding to a nonemergency call on his police motorcycle. No other punishment given was given.

33. On July 27, 2012, Mr. Rivas was provided with his annual evaluation by Sergeant Schroeder. Mr. Rivas received a 3.277 overall score on a 5-point scale; with a CAM score of 3.286, statistics score of 3.5, and a production and performance score of 2.75. The evaluation referenced perceived poor time management due to use of overtime; as well as the written reprimand for speeding. Mr. Rivas received a Professional/Personal conduct score of 3.571.

34. On November 24, 2012, Mr. Rivas mobilized for deployment to Afghanistan as a Captain

6

with the U.S. Army Reserves. Prior to departing, he had earned a position in the top ten officers of the department in the following categories: Arrests, Traffic Stops, Citations Issued, Accidents Investigated, and Driving While Impaired Arrests.

35. Before he left the Department, Mr. Rivas provided the Department with proper written notice of his deployment, and a copy of his Orders.

36. While deployed, Mr. Rivas worked as a Rule of Law Field Force Officer, earning the Bronze Star Medal for his work in training and developing the Afghan National and local police forces in the following: arrests, searches, and seizures and evidence collection.

37. Mr. Rivas returned to the United States on November 13, 2013 and his mother passed away only a few hours after his arrival. His demobilization process was shorted to only a few days and he returned home to Houston for the burial.

38. Mr. Rivas was officially released from military service on January 3, 2014, and he properly informed the Department in writing that he would return to service on March 3, 2014.

39. In February 2014, Mr. Rivas took the initiative to coordinate several events in preparation for his return to the Department which he voluntarily attended without pay. He attended a four (4) hour legal update training course, instructed by Lieutenant Greg Honings; two days of firearms training and qualification required to receive the city's newly issued Glock 17, instructed by Lieutenant Cliff Woitena; and conducted a new uniform fitting. Mr. Rivas kept both Sergeant Schroeder and Lieutenant Hera informed of his activities via email.

40. On February 19, 2014, Mr. Rivas had his motorcycle serviced and inspected. His motorcycle was stored immediately upon his deployment and any needed repairs were from use prior to deployment.

41. Despite Mr. Rivas' apparent efforts in acclimating back into the Department, Sergeant

Schroeder's demeanor and attitude towards Mr. Rivas changed upon Mr. Rivas' return from deployment and Sergeant Schroeder began subjecting Mr. Rivas to discriminatory and hostile treatment.

42. Mr. Rivas requested motorcycle refresher training via email to Sergeant Schroeder and Lieutenant Hera, which was never granted in spite of the fact that he had not worked as a Motors Officer in over seventeen (17) months.

43. Motorcycle training is important to officer safety in remaining proficient on the motorcycle, and in addition to the two intensive training programs he had successfully completed at the onset of becoming a Motors Officer, Mr. Rivas also conducted refresher training monthly with neighboring departments prior to his deployment.

44. On March 3, 2014, Mr. Rivas returned to service with the department as scheduled. He was provided one day to review police policy and applicable laws.

45. On March 4 and 5, 2014, Mr. Rivas rode in police cars with Officer Matt Strachan and Officer Jennafer Woitena to refresh himself on traffic duties.

46. On March 6, 2014, Mr. Rivas was scheduled to ride with Officer Woitena, but informed the proper authorities that he would not be into work due to illness. This was the approximately the third time in his entire tenure with the department, and had accrued in excess of 400 hours of accumulated sick leave. When Mr. Rivas notified Sergeant Schroeder, he was directed via text to submit his time sheet for the pay period by Monday, March 9, 2014, as department policy had changed in his absence requiring his review prior to final submission. Timesheet submission procedures changed during Mr. Rivas' deployment which Mr. Rivas had no prior knowledge.

47. On the weekend of March 7-8, 2014, Mr. Rivas returned to his Army Reserve unit for the first battle assembly since being deploying. Mr. Rivas was not scheduled to work by the police

department over this weekend. Sergeant Schroeder texted Mr. Rivas a reminder to submit time sheet on Sunday, March 8, 2014. Following reserve duty, Mr. Rivas went into the police department and submitted his timesheet at approximately 2200, March 8, 2014. Mr. Rivas texted Sergeant Schroeder to inform him and did received any response.

48. On March 10, 2014, Mr. Rivas attended a police car driving course put on by the department at the Pasadena Police Department training track. Following the day's training, Mr. Rivas was called to the station by Sergeant Schroeder and berated for filling out my time sheet late on Sunday.

49. Mr. Rivas informed Sergeant Schroeder that he was performing his military duty but still completed his tasking by the deadline he had given. Mr. Rivas was then told that he communicated poorly with the chain of command.

50. As this was Mr. Rivas' first face-to-face meeting with Sergeant Schroeder since his return, Mr. Rivas asked to be moved from the Tuesday-Friday shift to the Monday-Thursday shift as he had earned seniority within the traffic division. Sergeant Schroeder initially responded that he was not going to allow Mr. Rivas to tell him how to run his division but then stated due to Mr. Rivas' display of poor judgement, he needed to be supervised closely by remaining on the same Tuesday-Friday shift as he was.

51. Mr. Rivas was unware of this type of punishment ever being levied against any other officer, with shift assignment based entirely upon seniority in the special operations division.

52. On March 11, 2014, Mr. Rivas completed the second day of police car driving course.

53. On March 12/13, 2014, Mr. Rivas took the Sergeant promotion exam.

54. Throughout this time and at the beginning of the week of March 17th, Mr. Rivas searched out all needed equipment to perform his duties; to include: laptop computer, printer, electronic

ticket writer, window tint meter, lapel camera, radio, and speed laser gun. The only equipment specifically issued Mr. Rivas was the computer by League City's IT department. All other equipment was dispersed throughout the common area of the traffic division. Unfortunately, hand receipts were not specifically issued for traffic equipment to include firearms.

55. Sergeant Schroeder's only input was to inform Mr. Rivas that he had two lapel cameras on his desk which he believed to be operable. After repeated attempts by Mr. Rivas to get them to work, both proved to be inoperable. Mr. Rivas informed Sergeant Schroeder of this via email.

56. The Department's policy states in pertinent part, "employees shall promptly report the need for repairs of any City property issued to, used, or possessed by them." Mr. Rivas demonstrated an understanding and adherence to this policy by trying everything in his power to bring the lapel cameras back into functionality prior to reporting the need for repairs to Sergeant Schroeder. The requested equipment and training were necessary in order from Mr. Mr. Rivas to resume his traffic duties.

57. Sergeant Schroeder's discrimination continued on March 10, 2014, when Sergeant Schroeder accused Mr. Rivas of filing his timecard late. Specifically, Mr. Rivas' timecard was due on Monday, March 9, 2014. Mr. Rivas timely submitted his timecard on Sunday, March 8, 2014. Notably, from March 7, 2014 through March 8, 2014, Mr. Rivas was at his reserve unit for his first battle assembly since deployment. He also had both days off from work. Nonetheless, he interrupted his service to comply with Sergeant Schroeder's request, and prepared his timecard for submission on Sunday, March 8, 2014.

58. On March 10, 2014, Sergeant Schroeder called Mr. Rivas into his office and berated him for allegedly submitting his timecard late. He also complained that Mr. Rivas was unavailable during his military duty the weekend prior. During the conversation, and in response to Mr.

Rivas' prior requests regarding his shifts, Sergeant Schroeder told Mr. Mr. Rivas that he was not going to "tell him how to run [Sergeant Schroeder's division]." Sergeant Schroeder was clearly alluding to the inconvenience caused by Mr. Rivas' military schedule, his absence from the job for over seventeen months and his disapproval of same. Sergeant Schroeder also threatened Mr. Rivas, and told him that he was purposely placing Mr. Rivas on the Tuesday-Friday shift so that he could supervise Mr. Rivas' actions.

59. On March 11, 2014, Mr. Rivas was again denied access to the training and the equipment that he needed to resume his duties. Instead, Sergeant Schroeder assigned him to a second police car driving course, which was of no use to Mr. Rivas' position.

60. Thereafter, the harassment and discrimination continued. Mr. Rivas spent over a week searching for equipment so that he could resume his duties. Sergeant Schroeder failed to lend Mr. Rivas any assistance. The equipment was dispersed throughout the common area of the traffic division and most of it was inoperable. Mr. Rivas was forced to find equipment around the facility so that he could return to his actual position. Typically, when Officers arrive to duty, Sergeant Schroeder quickly provides equipment.

61. On March 19, 2014, Mr. Rivas finally resumed his traffic duties. He was responsible for speed enforcement, and used the LIDAR to clock speeding vehicles. To date, the Department had not provided Mr. Rivas with a holster for the LIDAR. Mr. Rivas continued to use the side mounted holster that he created back in June 2012.

62. On his third day back on traffic duty as a Motor Officer (no more than three days later on March 21, 2014), Mr. Rivas' laser fell from his motorcycle while he was initiating a traffic stop which resulted in some damage to the unit. He called his co-worker, Officer Jennafer Woitena, (hereinafter, "Officer Woitena") and requested to borrow her Light Detection and Ranging

11

(hereinafter, "LIDAR"[1]) for the remainder of the day, so that he could continue working. Later that day, Officer Woitena's LIDAR also fell from Mr. Rivas' motorcycle. This occurred while Mr. Rivas was responding to an accident. Mr. Rivas was unable to retrieve the LIDAR, and immediately notified Sergeant Schroeder that the LIDAR was lost.

63. On March 26, 2014, Sergeant Schroeder initiated an administrative investigation against Mr. Rivas regarding the lidars. Sergeant Schroeder accused Mr. Rivas of making inconsistent statements in response to the investigation. For example, Sergeant Schroeder fixated on the fact that Mr. Rivas did not initially mention that the LIDAR that he lost was Officer Woitena's. He also relied upon the fact that Mr. Rivas did not instantly file a report when he dropped his LIDAR on March 21, 2014, and the fact that Mr. Rivas did not mention that Ms. Woitena was aware of the incident when he was interviewed.

64. Thereafter, on March 31, 2015 Sergeant Schroeder levied seven (7) additional and unsubstantiated charges against Mr. Rivas including, but not limited to: violating the Department's officer conduct policy for suspected untruthfulness regarding his military leave, and violating the operations of police vehicles during a traffic stop on March 21, 2014.

65. Soon thereafter, on May 7, 2014, the Department levied another charge against Mr. Rivas for allegedly violating the Department's sick policy on March 7, 2014, while he was away serving at his reserve unit.

---

[1] LIDAR technology operates on the "time of flight" or "Time-Distance" principle. The laser units transmit infrared light pulses at a moving object. Since the speed of light is known, it is possible to ascertain the distance of an object by the time it takes for a beam to bounce off an object and return. Changes in that distance over time provide the vehicle's speed, a computation that is based on an average of hundreds of laser light pulses hitting the object in a fraction of a second. When used for speed or distance measurement, laser devices are also known by the name LIDAR (an acronym for Light Detection and Ranging) technology. Speed measuring lasers are also sometimes referred to as a laser speed measurement device (LSMD). LIDAR devices are often used in high traffic areas, since the laser beam can easily focus on individual vehicles, allowing pinpoint accuracy. The officer can accurately measure the speed of a vehicle, even in heavy traffic. Rules for operating LIDAR technology as traffic lasers vary from state to state.

66. On May 20, 2014, Mr. Rivas was placed on indefinite suspension for his alleged untruthfulness in connection with the March 21, 2014 laser and traffic stop, and the damage to the two lidars.

67. Mr. Rivas elected to appeal his indefinite suspension to a third-party hearing officer, and an arbitration hearing was held on July 7, 2015 and July 8, 2015. The Hearing Examiner upheld Mr. Rivas' indefinite suspension.

## VII. FIRST CAUSE OF ACTION
(Discrimination under 38 U.S.C. §§ 4301 *et seq.*)

68. Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 67 of this complaint as if set forth fully herein.

69. The prevailing purpose of USERRA is to encourage non-career military service, minimize disruption based on such service, and prevent discrimination against service members. See 38 U.S.C. § 4301. The United States Supreme Court has repeatedly recognized that USERRA is "to be liberally construed for the benefit of those who left private life to serve their country." *See, Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285 (1946). As such, USERRA prohibits discrimination and reprisal against members of the uniformed service.

70. In June 2014 Defendants violated USERRA by terminating Plaintiff on the basis of his membership, service, and obligation in the U.S. Army Reserves which Defendants used as a motivating factor to terminate Plaintiff's employment.

71. USERRA § 4311(a) states in pertinent part that "a person who is a member of… uniformed service shall not be denied…retention in employment…or any benefit of employment by an employer on the basis of that membership…" The term "benefit of employment" is quite broad and includes a service member's right to freedom from harassment and a hostile work

environment. See, 38 U.S.C. § 4303(2). ..." The statute goes on to state that, "[a]n employer shall be considered to have engaged in actions prohibited...under subsection (a), if the person's membership,...service,...or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership,...service,...or obligation for service." § 4311(c)(1). As such, once an employee shows that his military service was a "motivating factor" in termination, the employer bears the burden of proving that it would have terminated the employee's position in the absence of the employee's service.

72. At all relevant times, herein, Plaintiff is/was a military service member in the U.S. Army Reserve.

73. The Department violated USERRA § 4311(a) by wrongfully harassing and terminating Plaintiff. He was a faithful and dedicated employee whose dedication, talent, and work ethic resulted in his assignment to the Special Operations Unit in August 2011. He succeeded at the Department, and worked without issue for three (3) years. However, in 2012, Plaintiff was deployed, and when he returned, Sergeant Schroeder began micromanaging him, and ostracizing him. It is clear that Plaintiff's military schedule inconvenienced and irritated Mr. Schroder, as Sergeant Schroeder refused to provide Plaintiff with proper equipment and training upon his return, berated him without reason, and ensured that Plaintiff's work schedule mirrored his work schedule so that he could micromanage Plaintiff. Sergeant Schroeder also complained about the timecard that was submitted by Plaintiff while he was attending battle assembly, and criticized Plaintiff for being unavailable while attending military duty.

74. Significantly, three (3) days after Plaintiff was finally able to resume his job duties, Sergeant Schroeder crafted a pretext for terminating Plaintiff's position. The close proximity

between the date that Mr. Rivas returned from his deployment and the date that he was placed on indefinite suspension makes it clear that Plaintiff's military status was a motivating factor in Department's decision to place him on indefinite suspension. *See, Maxfield v. Cintas Corp.* No. 2, 427 F.3d. 544, 552 (8th Cir. 2005); *Hance v. Norfolk Southern Ry. Co.*, 571 F.3d. 511 (6th Cir. 2009) (Employer's liability was based in part on plaintiff's termination upon return from two-week training). Moreover, Sergeant Schroeder subjected Plaintiff to an administrative investigation because lidars fell from his motorcycle, and then placed him on indefinite suspension, an excessive punishment. The Department also placed Plaintiff on indefinite suspension despite the fact that the Department wholly failed to provide Mr. Rivas with a holster to hold the LIDAR in place.

75.  The Department even misrepresented the Brady standard to make it appear as though Plaintiff's testimony would no longer be admissible in Court. The impeachment information that the government is required to disclose under Brady is limited to "evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest, and evidence that otherwise directly impacts the witness' trial testimony." *U.S. v. Bagley*, 473 U.S. 667 (1985). The United States Department of Justice's Attorney Manual provides the applicable policy followed by prosecutors regarding disclosure of exculpatory and impeachment information. See U.S.A.M. §9-5.001. The policy recognizes that "a trial should not involve the consideration of information which is irrelevant or not significantly probative of the issues before the court," and "should not involve spurious issues or arguments which serve to divert the trial process from examining the genuine issues." U.S.A.M. §9-5.001(C). As such, Brady disclosures do not necessarily include any and all possible negative references to a person's credibility or skeletons in their employment history.

76. Furthermore, although Federal Courts typically accord broad deference to arbitration decisions, the Courts explicitly recognize as an exception to this rule that courts are not bound by arbitration decisions in employment discrimination cases. *Hance v. Norfolk Southern Ry. Co.*, 571 F.3d 511, 519 (6th Cir. 2009). A federal court can reconsider evidence rejected by an arbitrator in previous proceedings. *Id*. "An arbitrator's decision regarding just cause for termination is not equivalent to the inquiry and burden-shifting framework mandated by Congress in an employment discrimination case." *Id*. To adopt an arbitrator's decision "would unnecessarily limit the plaintiff's opportunity to vindicate his statutory and constitutional rights." Id. Hence, the Court would not consider the Hearing Examiner's decision as binding in this case, and would recognize Mr. Schroder's unlawful discrimination which led to the termination of Plaintiff in violation of USERRA.

77. The Defendant's further violated USERRA by subjecting Plaintiff to constant harassment and discrimination immediately after he returned to work after his deployment. Sergeant Schroeder berated Plaintiff over a timesheet solely because he was unavailable while on military duty, denied him access to the necessary equipment and trainings upon his return to work, and threatened him. The facts that Plaintiff was subjected to an administrative investigation, placed on indefinite suspension for the March 21, 2015 LIDAR incident, and that the Defendant's misrepresented Plaintiff as untruthful before a Hearing Officer, make it abundantly clear that his work environment was hostile.

78. Plaintiff's military service was a motivating factor in the actions taken by League City Police Department and Sergeant Schroeder. As a direct and proximate result of the conduct by Defendant's has suffered injury including but not limited to termination, denial of promotion, loss of wages, job assignments, retirement savings, time in service, benefits of employment, and

has incurred pain and suffering from the stress and uncertainty surrounding his termination.

79.     Defendants' violation of USERRA was willful and in reckless disregard of Plaintiff's rights under the statute.

## VIII. DEMAND FOR JURY TRIAL

80.     Mr. Rivas demands trial by jury pursuant to Fed.R.Civ.P. 38 of all issues so triable at law.

## IX. REQUESTED RELIEF

WHEREFORE, Plaintiff requests this Court enter judgment against Defendant, as follow:

A.      Declare that Defendant's actions were in violation of USERRA's employment provision, 38 U.S.C. §4311;

B.      Order Defendant to comply with the provisions of USERRA;

C.      Order Defendants pay Plaintiff all amounts due to him for loss of wages and other benefits of employment cause by Defendants' violation of USERRA to include but not limited to costs of suit, inclusive of reasonable attorneys' fees, expert witness fees, and other litigation expenses pursuant to 38 U.S.C. §4323(h)(2);

D.      Award Plaintiff liquidated damages in an amount equal to the amount of lost wages and other benefits of employment suffered by reason of Defendants' willful violations of USRRA, pursuant to 38 U.S.C. §4323(d)(1)(C);

E.      Reinstate Plaintiff into the position held previous to his termination pursuant to 38 U.S.C. §4311;

F. Grant any other such relief as may be due and just.

Respectfully submitted this 8th day of May 2018.

Dated: May ___, 2018        GAVINO MR. RIVAS

Houston, TX

                  By his Attorneys:

                  /s/ *Sean Timmons*
                  Sean Timmons
                  Tully Rinckey P.L.L.C.
                  2925 Richmond Avenue, 12th Floor
                  Houston, TX 77098
                  518) 218-7100
                  (315) 238-5200 (facsimile)

TO: CITY OF LEAGUE CITY
    Mr. Nghiem, Doan
    City Attorney
    300 West Walker
    League City, Texas 77573
    TEL: (281) 554-1003
    Nghiem.Doan@leaguecity.com

    LEAGUE CITY POLICE DEPARTMENT
    555 W. Walker Street
    League City, TX 77573

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

-----------------------------------------------------------------x

GAVINO MR. RIVAS,                                   Case No.:

                             Plaintiff,

                                                                                      **VERIFICATION**

   -against-

CITY OF LEAGUE CITY and LEAGUE CITY POLICE
DEPARTMENT,

                             Defendants.

-----------------------------------------------------------------x

    I, GAVINO MR. RIVAS, being duly sworn and under oath, do hereby verify that I am the party-Plaintiff to the above-captioned civil action, I have read the allegations of the within *Complaint* and I attest to the truth thereof.

                                                                       GAVINO MR. RIVAS

STATE OF ~~TEXAS~~ Florida (F.A) )
                                     ) ss.:
COUNTY OF Miami Dade )

    On the 4 day of ~~September~~ May in the year ~~2016~~ 2018, before me, the undersigned, Gavino Mr. Rivas, personally appeared, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual executed the instrument.

FREDERICK AGUILERA
MY COMMISSION #GG177959
EXPIRES: JAN 22, 2022
Bonded through 1st State Ins

NOTARY PUBLIC

19